## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 22-CR-20505-GAYLES/TORRES

UNITED STATES OF AMERICA

    *Plaintiff*,

v.

KEVIN ABARCA, and
JORGE PEREZ-DECESPEDES,

    Defendants.

_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S COUNT 13 MOTIONS

    This matter is before the Court on three motions filed by Defendant Kevin Abarca.[1]  Each of these motions relates to Count 13 in the superseding indictment, which specifically charges Defendant with being a convicted felon in possession ammunition in violation of 18 U.S.C. § 922(g)(1).[2]  Count 13 further alleges that Defendant is eligible for the 15-year mandatory minimum sentence prescribed by the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1) ("ACCA").[3]  Defendant first seeks to dismiss Count 13 altogether.  Defendant then alternatively moves to strike the ACCA allegation in Count 13.  Lastly, assuming that neither his motion to dismiss nor his motion to strike prove meritorious, Defendant asks to bifurcate his trial on Count 13 from the other 17 charges in the superseding indictment.  The motions are

---

[1]    [D.E. 184, 186, and 188].
[2]    [D.E. 125 at 11-12].
[3]    *Id.*

fully briefed, and they have been referred to the undersigned for a report and recommendation.[4]  Having reviewed the briefing and the relevant authority, and being otherwise fully advised in the premises, the Court finds for the reasons discussed below that Defendant's motion to dismiss Count 13 should be **DENIED**, Defendant's motion to strike the ACCA allegation from Count 13 should be **DENIED**, and Defendant's motion to bifurcate the trial should be **GRANTED**.

## I.   BACKGROUND

The superseding indictment alleges that Defendant has committed 18 federal crimes.  One of these crimes – Count 13 – is a violation of 18 U.S.C. § 922(g)(1), which Defendant allegedly committed on October 6, 2020, by knowingly possessing ammunition even though he is a convicted felon who is prohibited by law from possessing firearms and ammunition.  The Government further alleges in Count 13 that Defendant has three ACCA predicate offenses in his criminal record, subjecting him to a mandatory minimum sentence of 15 years in prison if he is convicted of the § 922(g)(1) offense.

## II.   ANALYSIS

In response to these allegations, Defendant first moves the Court to dismiss Count 13 in its entirety.  Having recently resolved a nearly verbatim argument made in a similar case, *see United States v. Alvin*, Case No. 22-cr-20244, D.E. 105 (S.D. Fla. May 22, 2023), the Court remains unpersuaded that the Second Amendment to the Constitution of the United States precludes the Government from prosecuting

---

[4]      [D.E. 200, 202, 204, 209, 216, 217, 218].

Defendant for a violation of § 922(g)(1) because of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022).

Defendant next attacks Count 13 with a motion to strike its ACCA allegation. Again, having recently resolved nearly verbatim arguments in *Alvin*, we remain unpersuaded that the current state of the law surrounding ACCA necessitates the striking of the Government's allegation. *United States v. Alvin*, Case No. 22-cr-20244, D.E. 180 (S.D. Fla. Dec. 28, 2023).

Finally, as an alternative to dismissing Count 13 or striking its ACCA allegation, Defendant asks the Court to try Count 13 separately from the other charges in the superseding indictment. For the reasons discussed below, we are persuaded that Count 13 should be severed and therefore tried separately from the balance of crimes charged in the superseding indictment. We therefore proceed to address each of Defendant's arguments below.

### A. *The Motion to Dismiss Count 13 on Second Amendment Grounds.*

A motion to dismiss an indictment is governed by Federal Rule of Criminal Procedure 12(b), which allows a defendant to challenge an indictment on various grounds, including failure to state an offense, lack of jurisdiction, or constitutional reasons. *See United States v. Kaley*, 677 F.3d 1316, 1325 (11th Cir. 2012).

An indictment "may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987). Further, "[t]he sufficiency of a criminal indictment is

determined from its face." *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992). The indictment's allegations are assumed to be true and are viewed in the light most favorable to the Government. *See Torkington*, 812 F.2d at 1354.

Defendant's first motion [D.E. 184] challenges the constitutionality of § 922(g)(1), arguing that the Supreme Court's recent opinion in *Bruen* renders § 922(g)(1) facially unconstitutional. Specifically, Defendant contends that, despite being a convicted felon, his possession of ammunition is "presumptively protected" by the plain text of the Second Amendment.[5] And therefore, Defendant insists that, under the two-part "test and history" test prescribed by *Bruen*, the Government bears the burden of showing that § 922(g)(1) is consistent with our nation's historical tradition of firearm regulation if it wants the statute to pass constitutional muster. In Defendant's view, the Government cannot meet its burden and therefore Count 13 should be dismissed. The Court disagrees.

The Court finds Defendant's arguments unpersuasive for two reasons. First, Defendant's theory that his possession of a firearm is conduct presumptively protected by the Second Amendment fails because this argument has been foreclosed by binding Eleventh Circuit precedent. Indeed, the Eleventh Circuit has expressly, and repeatedly, stressed that convicted felons fall within a class of individuals that are "disqualified from the exercise of Second Amendment rights," *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010), and, as such, are unprotected by the right

---

[5]   The Second Amendment provides: "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

4

to keep and bear arms.  On this score, Defendant gets ahead of himself in attributing to *Bruen* revolutionary implications that purportedly overruled in blanket fashion the Supreme Court's, and the Eleventh Circuit's, Second Amendment jurisprudence. Defendant's suggestion that *Bruen* effectively undermined the legal underpinnings of *Rozier* and its progeny is therefore simply wrong.

Second, even assuming that Defendant's conduct is protected by the right to bear arms as articulated in *Bruen*, Defendant's motions should still be denied because the Government has proffered sufficient historical evidence to support the conclusion that § 922(g)(1) is consistent with this nation's historical traditions of firearm regulations and therefore satisfies *Bruen* review.

The Eighth Circuit's decision in *Sitladeen* lends support to our reasoning.  *See United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023).  There, the Eighth Circuit rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(5)(A), which prohibits firearm possession by noncitizens, concluding that the question was controlled by prior circuit precedent holding that individuals subject to the statute "are not part of 'the people' to whom the protection of the Second Amendment extend."  *Id.* at 987. The Eighth Circuit reasoned that the analysis in *Flores* – an Eight Circuit opinion that tracks the Eleventh Circuit's analysis in *Rozier* – was "consistent with" the Supreme Court's decision in *Bruen* because *Flores* did not rely on a means-end scrutiny assessment but rather concluded that the conduct at issue was not protected by the plain text of the Second Amendment:

> Though the opinion is short on explanation, it is unmistakable that our holding in *Flores* is about the plain text of the Second Amendment—

about what is meant by the phrase, "the people." *See* 663 F.3d at 1023. Unlike the Second, Seventh, Ninth, and Tenth Circuits, we did not reach our conclusion that § 922(g)(5)(A) is constitutional by engaging in means-end scrutiny or some other interest-balancing exercise. *See id.* Rather, as the unqualified language of the opinion and the citation to *Portillo-Munoz* make clear, we reached our conclusion by considering— consistent with what *Bruen* now requires—whether the conduct regulated by § 922(g)(5)(A) was protected by the plain text of the Second Amendment. And we determined that it was not, as unlawfully present aliens are not within the class of persons to which the phrase "the people" refers. Nothing in *Bruen* casts doubt on our interpretation of this phrase. *See* 142 S. Ct. at 2134 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."). Indeed, *Bruen* "decide[d] nothing about who may lawfully possess a firearm." *Id.* at 2157 (Alito, J., concurring) (emphasis added). Therefore, we remain bound by *Flores. See Young v. Hayes,* 218 F.3d 850, 853 (8th Cir. 2000) (discussing the prior-panel rule).

*Id.* at 984–985.

As explained in more detail below, we too remain bound by *Rozier.* Much as in *Flores,* the *Rozier* panel did not reach its conclusion by engaging in a means-end scrutiny or other interest-balancing exercise. Rather, *Rozier*'s approach was confined to "step one" of the *Bruen* equation. *See Rozier,* 598 F.3d at 770. As the Eleventh Circuit expressly put it, "the initial question is whether one is qualified to possess a firearm" and the defendant did not make it past this threshold inquiry because, as a convicted felon, the Court found that he was "disqualified from the exercise" of Second Amendment rights. *Id.*; *cf. Nat'l Rifle Ass'n v. Bondi,* 61 F.4th 1317, 1321 (11th Cir. 2023) (explaining that after *Heller* the Eleventh Circuit adopted a two-part test, and that *Bruen* "abrogated [only] step two of this framework").

Subsequent Eleventh Circuit precedent makes clear that *Rozier*'s holding focused on the threshold inquiry of whether the conduct at issue (*i.e.*, a felon's

possession) was conduct protected by the Second Amendment. Hence, felons categorically "may be 'disqualified from' possessing arms without violating the Second Amendment" because regardless of the scope of "the people," the "particular history" of the right to keep and bear arms "demonstrates that it extended (and thus extends) to some categories of individuals, but not others" – and, in particular, *not* to felons. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022) (citing *Rozier*, 598 F.3d at 770–771); *see also Jimenez-Shilon*, 34 F.4th at 1052 (Newsom, J., concurring) (the "[Eleventh Circuit has] never applied means-ends scrutiny in a published decision analyzing a Second Amendment challenge.").

Our conclusion that *Rozier* was not abrogated by *Bruen* finds ample support in the rulings of several district courts within our circuit. Thus, we find that § 922(g)(1) is facially constitutional and Defendant's motion should be denied. *See, e.g., United States v. Meyer*, No. 22-cr-10012, 2023 WL 3318492, at *3–4 (S.D. Fla. May 9, 2023) (holding that *Rozier* is good law and observing that "every federal judge who has considered this question since *Bruen*" has upheld the validity of § 922(g)(1)); *United States v. Isaac*, No. 22-cr-00117, 2023 WL 1415597, at *5 (N.D. Ala. Jan. 31, 2023) ("*Bruen* did not disturb *Heller* but took great lengths to clarify it, and nothing in *Bruen* conflicts with the Eleventh Circuit's construction of *Heller* regarding § 922(g)(1)'s harmony with the Second Amendment."); *United States v. Williams*, No. 21-cr-00362, 2022 WL 17852517, at *2 (N.D. Ga. Dec. 22, 2022) ("the Court concludes that *Rozier* remains controlling precedent in this circuit.").

This Court is bound by precedent from the Eleventh Circuit unless and until such precedent is "overruled" or "undermined to the point of abrogation" by the Supreme Court of the United States. *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (citing *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001)). Accordingly, we are bound to follow Eleventh Circuit precedent that, relying on *Heller* and *McDonald*, has foreclosed Defendant's argument by categorically excluding a felon's possession of a firearm from the range of conduct that is presumptively protected by the Second Amendment. *See Atlantic Sounding Co. v. Townsend*, 496 F.3d 1282, 1284 (11th Cir. 2007) (explaining that a later panel may depart from an earlier panel's decision only when the intervening Supreme Court decision is "clearly on point"); *see also Sitladeen*, 64 F.4th at 987 ("[*Rozier*'s] textual interpretation may or may not be correct. But until the Supreme Court or our en banc [appeals court] determines otherwise, the law of our circuit is that [convicted felons] are not part of 'the people' to whom the protections of the Second Amendment extend."). As we note below, neither *Bruen*'s holding nor its reasoning is at odds with the Eleventh Circuit precedent that governs this case. *Rozier* thus forecloses Defendant's facial challenge to Count 13.

### 1. Bruen *does not explicitly or implicitly abrogate* Rozier.

The substance of Defendant's motion to dismiss nevertheless suggests that *Bruen* disrupted an entire body of law, but this extreme proposition is neither supported by *Bruen* nor the precedents upon which it relied. It therefore comes as no surprise that this theory has been rejected by a multitude of courts across the country,

even within our circuit, which have upheld the constitutionality of § 922(g)(1) in the wake of *Bruen*.

We begin with a short review of the Supreme Court's *Heller* and *McDonald* rulings, which provide the legal foundation for the Eleventh Circuit's reasoning in *Rozier* and the cases that followed it. We then discuss the controlling Eleventh precedent that forecloses Defendant's argument, followed by a discussion of how *Bruen* left this body of case law undisturbed.

        a.   <u>Supreme Court precedent in *Heller* and *McDonald*.</u>

In *Heller*, the Supreme Court undertook its "first in-depth examination of the Second Amendment." *Heller*, 554 U.S. at 635. At issue was the constitutionality of the District of Columbia's ban on the possession of handguns in the home. *Id.* at 573. Mr. Heller was a law enforcement officer who was permitted to carry a handgun while on duty but was not permitted to register or keep a handgun in his home. *Id.* at 575-76. The Supreme Court held, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.* at 595. Justice Scalia, writing for the Court, first analyzed the plain language of the text of the Second Amendment. *See id.* at 576-600. Ultimately concluding that the Second Amendment secures an individual right to bear arms for self-defense (and not just for use in a militia), the Supreme Court observed that "the inherent right of self-defense has been central to the Second Amendment right." *Id.* at 628.

The Supreme Court cautioned, however, that "the right secured by the Second Amendment is not unlimited" and recognized that this right "was not a right to keep

and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Although the Supreme Court did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," it expressly instructed that nothing in its opinion should be taken "to cast doubt on longstanding prohibitions" on the possession of firearms by convicted felons. *Id.* The Supreme Court believed this prohibition to be a "presumptively lawful" regulatory measure that falls within the "exceptions" to the right to bear arms. *Id.* at 627 n.26, 635.

Moreover, throughout its ruling, the Supreme Court stressed that the right of possession embodied in the Second Amendment is "the right of *law-abiding*, responsible citizens to use arms in defense of hearth and home," and suggested that certain individuals, such as "felon[s]" and the "insane," are disqualified from exercising Second Amendment rights. *Id.* at 631, 635 (emphasis added); *see also id.* at 620 ("We described the right protected by the Second Amendment as 'bearing arms for a lawful purpose'"); *id.* at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."); *id.* at 630 (holding that the D.C. law prohibited firearm use "for the core lawful purpose of self-defense").

Two years later, in 2010, the Supreme Court struck two Illinois city handgun bans in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), holding that the Second Amendment is fully applicable to the States through the Fourteenth Amendment. In so doing, a plurality repeated its "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626).

10

b.     Eleventh Circuit precedent following *Heller*.

Although the Eleventh Circuit has not "ventured onto the terrain of post-*Heller*
Second Amendment jurisprudence" on too many occasions, *GeorgiaCarry.Org, Inc. v.
U.S. Army Corps of Engineers*, 788 F.3d 1318, 1323 (11th Cir. 2015), the Court's
available guidance in this domain is fatal to Defendant's motion for two reasons.
First, Eleventh Circuit precedent makes clear that convicted felons fall within a class
of individuals that is disqualified from the exercise of Second Amendment rights. And
second, Eleventh Circuit precedent establishes that § 922(g)(1) is constitutionally
viable.  We are compelled to follow this precedent.

In *Rozier*, the Eleventh Circuit upheld the constitutionality of § 922(g)(1) and
ruled that convicted felons are not protected by the right to keep and bear arms. The
defendant in *Rozier* had previously been convicted of a felony but nevertheless
challenged his § 922(g)(1) conviction on the ground that his possession of a handgun,
as in *Heller*, took place "in the home and for the purposes of self-defense." *Rozier,* 598
F.3d at 769-70.  The Court rejected this argument and held that, regardless of the
weapon's purpose, the defendant was not qualified to possess a firearm in the first
place by virtue of his status as a felon.  *Id.* at 770-71.  Citing to *Heller*'s instruction
that "nothing in our opinion should be taken to cast doubt on longstanding
prohibitions on the possession of firearms by felons," and to the Supreme Court's
reference to individuals "disqualified from the exercise of Second Amendment rights,"
the Eleventh Circuit held that § 922(g)(1) is "a constitutional avenue to restrict the
Second Amendment rights of certain classes of people."  *Id.* at 771.  The defendant in

*Rozier*, by virtue of his felony conviction, fell within such a class. *Id.* Accordingly, the circumstances surrounding the defendant's possession of a firearm in violation of § 922(g)(1) were irrelevant, and so the Eleventh Circuit upheld his conviction under the statute. *Id.* at 772.

The Eleventh Circuit reiterated the central holding of *Rozier* (*i.e.*, that convicted felons are part of a class of individuals disqualified from the exercise of Second Amendment rights) and its binding character in subsequent Second Amendment cases. In *GeorgiaCarry.Org*, the Eleventh Circuit rejected a Second Amendment challenge to 36 C.F.R. § 327.13, a federal law that prohibited the possession of loaded firearms or ammunition on property managed by the United States Army Corps of Engineers. *GeorgiaCarry.Org*, 788 F.3d at 1320. In its ruling, the Court referred to its prior holding in *Rozier*, and explained that the *Rozier* court "relied on *Heller's* self-limiting dictum" in reaching its holding. *See id.* at 1324. This is notable because, as the Court instructed in *Rozier*, "to the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by law-abiding and qualified individuals, it is not dicta." *Rozier*, 598 F.3d at 771 n.6 (citing *Denno v. Sch. Bd. of Volusia Cty., Fla.*, 218 F.3d 1267, 1283 (11th Cir. 2000)); *see also United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010) (observing that the Eleventh Circuit "must follow" Supreme Court dictum).

Two years later, in *United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017), a case dealing with the unlicensed sale of firearms through the dark web, the Eleventh Circuit reiterated its understanding of *Heller* as supportive of the view that measures

disarming convicted felons "comport with the Second Amendment because they affect *individuals or conduct unprotected* by the right to keep and bear arms." *Id.* at 1286 (emphasis added). The Court noted that, "[a]ccounting for these types of longstanding prohibitions," it has upheld the constitutionality of § 922(g)(1) because statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment. *Id.* at 1286 (citing *Rozier*, 598 F.3d at 771). Observing that this line of precedent "provides examples of laws that do not substantially burden the Second Amendment," the Eleventh Circuit concluded that 18 U.S.C. § 922(a)(5), much like § 922(g)(1), survives constitutional scrutiny. *Id.* at 1286-87.

In 2023, the Eleventh Circuit reiterated *Rozier*'s holding in a case dealing with a challenge to 18 U.S.C. § 922(g)(5)(A), which is a statute prohibiting the possession of firearms by illegal aliens. *Jimenez-Shilon*, 34 F.4th at 1043. In rejecting defendant's challenge, the Court avoided addressing the question of whether an illegal alien in defendant's position (*i.e.*, with extensive ties to the United States) could be said to be among "the people" protected by the Second Amendment. *Id.* at 1045. The Court found the inquiry unnecessary, holding instead that even if defendant were among "the people," § 922(g)(5)(A) was nevertheless legal because "illegal aliens" fall within a group of people who is disqualified from the exercise of Second Amendment rights. *Id.* at 1044-45. In so holding, the Eleventh Circuit relied on *Heller* and *Rozier*, unequivocally stating that, "as both the Supreme Court and this Court have observed, even individuals who are indisputably part of 'the people,' such

as dangerous felons . . . , *might not partake* of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment." *Id.* at 1046 (emphasis added). Because the question at hand was one of first impression, the Eleventh Circuit proceeded to survey historical precedents regarding the disarmament of illegal aliens and thereby concluded that such regulations are consistent with the Second Amendment's text and history. *Id.* 1046-50.

We are bound by this line of binding precedent, at least until an *en banc* Eleventh Circuit opinion pursues a very different path after *Bruen*, which is highly unlikely in our view. For now, the Eleventh Circuit has expressly and repeatedly stressed that convicted felons fall within a class of individuals that is "disqualified from the exercise of Second Amendment rights." *Rozier*, 598 F.3d at 771; *see also United States v. Dowis*, 644 F. App'x 882, 883 (11th Cir. 2016) ("Certain individuals— including convicted felons—are disqualified from the exercise of Second Amendment rights.") (quotation marks and citation omitted); *Flick v. Attorney General*, 812 F. App'x 974, 975 (11th Cir. 2020) ("Our reasoning in *Rozier* applies equally to Flick's as-applied challenge and thus forecloses it"); *United States v. Reverio*, 551 F. App'x 552 (11th Cir. 2014) ("Reverio argues that section 922(g)(1) interferes with his fundamental right to bear arms under the Second Amendment, but his argument is foreclosed by our holding in [*Rozier*]").

And in light of this line of controlling precedent, we are compelled to reject Defendant's claim that his possession of a ammunition comes squarely within the

14

Second Amendment's "plain text," making his conduct "presumptively protected" by the Second Amendment. This argument has been foreclosed by the Eleventh Circuit's explicit exclusion of convicted felons from the protections of the Second Amendment, and we find no justifiable reason to depart from this governing authority at this point. As we explain next, Defendant's suggestion that *Bruen* overruled this body of case law is unpersuasive.

c.   <u>*Bruen* does not upset Eleventh Circuit precedent.</u>

As noted above, we are bound to apply Eleventh Circuit precedent that forecloses Defendant's argument. Defendant asks this court, however, to depart from this line of precedent because, in his view, *Bruen* marks a dramatic shift in Second Amendment law that renders this line of circuit authority inapplicable. We disagree. While it is undeniable that *Bruen* shifts the framework for determining the constitutionality of *some* government regulations under the Second Amendment, Defendant's suggestion that *Bruen* completely undoes an entire body of law is an extreme proposition unsupported by *Bruen* – which expressly left the rulings in *Heller* and *McDonald* undisturbed – and a theory that has been rejected by a multitude of district courts across the country upholding the constitutionality of § 922(g)(1) in the wake of *Bruen*.

In *Bruen*, the Supreme Court addressed the constitutionality of New York's firearm licensing statute, which "condition[ed] issuance of a license to carry [a handgun] on a citizen's showing of some additional special need" beyond general self-defense. *Bruen*, 142 S. Ct. at 2122. The Supreme Court held that the Second

15

Amendment protected "an individual's right to carry a handgun for self-defense outside the home" and found New York's law unconstitutional in that it required this additional showing of special need. *Id.* In so holding, the Supreme Court clarified the standard set forth in *Heller* and rejected the sliding-scale form of scrutiny approach that Courts of Appeals, after *Heller*, had adopted for assessing Second Amendment challenges. *See id.* at 2129-30, 2134.[6] In striking down the licensing statute, the Court "made the constitutional standard endorsed in *Heller* more explicit," and specifically directed courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. *Id.* at 2126, 2134. Specifically, the Court reiterated that the standard for applying the Second Amendment is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30 (citation omitted).

The articulation of this more explicit test notwithstanding, the *Bruen* decision was careful to acknowledge that it did not overrule, or even cast into doubt, the legal underpinnings of felon-in-possession statutes as established in *Heller* and *McDonald.*

---

[6]     This included the Eleventh Circuit. "Like our sister circuits, we believe a two-step inquiry is appropriate: first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny." *GeorgiaCarry.Org,* 687 F.3d at 1261 (articulating for the first time the two-step inquiry for evaluating Second Amendment claims post-*Heller*).

To the contrary, in the very opening paragraph of the opinion, Justice Thomas, writing for the Court, reaffirmed *Heller* and *McDonald*, and he noted that both cases defined the right to bear arms as belonging to "law-abiding" citizens. *Id.* at 2122. The Court said:

> In *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and *McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home.

*Id.* at 2122.

Although the majority opinion did not specifically address *Heller*'s express carve-out regarding laws disarming convicted felons, that issue was simply not before the Supreme Court in *Bruen*. Nonetheless, the Justice Thomas underscored that the Court's holding was "in keeping with" *Heller* and *McDonald*, and he reiterated throughout his opinion that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms for self-defense," a phrase used by the Court *twelve* times in its decision. *See id.* at 2122, 2131, 2134, 2138, 2150, 2155.

The concurrences and dissents in *Bruen* offer further support to the conclusion that *Bruen* did not alter *Heller*, Eleventh Circuit precedent based on *Heller*, or the constitutional status of § 922(g)(1). Both Justice Alito and Justice Kavanaugh expressed in their concurring opinions their explicit intent to leave undisturbed government regulations prohibiting the possession of firearms by felons. For

example, Justice Alito stated: "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.* at 2157 (Alito, J., concurring).

Similarly, Justice Kavanaugh's concurring opinion, joined by Chief Justice Roberts, provided additional support for the continued viability of felon-in-possession restrictions in the wake of *Bruen*, stating that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," and restating *Heller*'s assurances that "[n]othing in our opinion should be taken to cast doubt on 'longstanding prohibitions on the possession of firearms by felons[.]'" *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27). This understanding was further embraced in Justice Breyer's dissent. Joined by Justice Sotomayor and Justice Kagan, Justice Breyer stated: "I understand the Court's opinion today to cast no doubt on" *Heller*'s treatment of laws prohibiting firearm possession by felons. *Id.* at 2189 (Breyer, J., dissenting).

In light of all these limitations to what the Supreme Court was addressing in *Bruen*, this Court is not persuaded that *Bruen* completely (and silently) turned the switch on the nation's Second Amendment jurisprudence and therefore abrogated the Eleventh Circuit's rationale for upholding the constitutionality of § 922(g)(1). Adopting Defendant's rationale would mean that *Bruen* effectively overruled Eleventh Circuit cases, such as *Rozier*, *GeorgiaCarry.Org*, and *Focia*, because those cases applied a "means-end" interest-balancing approach in order to uphold a plethora of federal firearms regulations. But a careful review of these cases reveals

that Defendant's argument is fatally flawed.  Indeed, the Eleventh Circuit has "never applied means-ends scrutiny in a published decision analyzing a Second Amendment challenge. Rather, we have always—and only—assumed that we would do so if we determined, in some unidentified future case, that a law 'restricted activity' that is 'protected by the Second Amendment in the first place.'" *Jimenez-Shilon*, 34 F.4th at 1052 (Newsom, J., concurring) (citations omitted).  In other words, and contrary to Defendant's position, it is far more accurate to say that the Eleventh Circuit precedent that binds us was decided during step one of the *Bruen* framework; a step that the Supreme Court deemed "broadly consistent with *Heller*."  *Bruen*, 142 S.Ct at 2127; *see also Rozier*, 598 F.3d at 770 ("[T]he initial question is whether one is qualified to possess a firearm.").

Against this backdrop, we cannot agree with Defendant's disruptive reading of *Bruen*.  Instead, we find that the Supreme Court left generally undisturbed the regulatory framework that precludes felons from possessing firearms by reaffirming its reasoning in *Heller* and *McDonald*.  Therefore, Defendant's suggestion that *Bruen* effectively undermined the Eleventh Circuit's rationale for excluding convicted felons from firearm possession and upholding the constitutionality of § 922(g)(1) is wholly unpersuasive.  Our conclusion is much more consistent with the Justices' express instructions in *Bruen,* and it finds ample support in recent cases addressing this same question in the wake of *Bruen*.  *See, e.g.*, *United States v. Young*, No. 22-cr-00054, 2022 WL 16829260, at *7 (W.D. Pa. Nov. 7, 2022) ("*Bruen*, *Heller* and *McDonald* dictate that Defendant's alleged conduct does not fall within the scope of the Second

Amendment's protections due to his felony drug convictions."); *United States of Am. v. Riley*, No. 22-cr-00163, 2022 WL 7610264, at *10 (E.D. Va. Oct. 13, 2022) ("A plain reading of the [Second Amendment] demonstrates that 'the people' remains limited to those within the political community and not those classified as felons."); *United States v. Minter*, No. 22-cr-00135, 2022 WL 10662252, at *3 (M.D. Pa. Oct. 18, 2022) ("*Bruen* does not, as Defendant suggests, invalidate or overturn the legal principles and analysis set forth in *Heller* and *McDonald*, and much of the legal reasoning in Circuit decisions since *Heller* remains intact."); *United States v. Carpenter*, No. 21-cr-00086, 2022 WL 16855533, at *3 (D. Utah Nov. 10, 2022) ("There is nothing in *Bruen* to indicate that either *Heller*, Tenth Circuit precedent based on *Heller*, or § 922(g)(1), are no longer valid."); *Fried v. Garland*, No. 22-cv-00164, 2022 WL 16731233, at *5 (N.D. Fla. Nov. 4, 2022) (*Bruen* "makes it difficult to dismiss the idea that non-law-abiding citizens have no Second Amendment rights.").

Based on this understanding of *Bruen*, we conclude that the Eleventh Circuit's decision in *Rozier*, and the cases that followed, remains good law and controls the disposition of Defendant's motion.  Defendant does not stand on equal footing with the plaintiff in *Bruen*: a "law-abiding" citizen who sought to use arms for self-defense. Here, by contrast, Defendant is alleged to be a recidivist violent offender who seeks to absolve himself of criminal liability despite knowingly possessing ammunition during the commission of a crime of violence.  That is not the Second Amendment value that *Bruen* (or any other Supreme Court case for that matter) is trying to

safeguard.  Accordingly, Defendant's motion to dismiss should be DENIED at step

one of the *Bruen* framework.

### 2.     Section 922(g)(1) is consistent with the nation's historical tradition of firearm regulation.

Even if we assumed, for the sake of argument, that Defendant's status as a

non-law-abiding citizen is now embraced by the Second Amendment based on the

scope and breadth of the reasoning in *Bruen*, § 922(g)(1) would still pass

constitutional muster because the Government has demonstrated, in accordance with

*Bruen*'s analytical framework, that the statute is consistent with this nation's

historical tradition of firearm regulation.  As the Eleventh Circuit has emphasized

time and again, "being a member of 'the people' to whom the Second Amendment

applies as a general matter is a necessary condition to enjoyment of the right to keep

and bear arms, but it is not alone sufficient." *Jimenez-Shilon*, 34 F.4th at 1044.  But

§ 922(g)(1) is also consistent with the nation's historical tradition of firearm

regulation, which means that the motion can be denied on this basis as well.

We have reviewed the historical record provided by the Government in support

of its opposition.  We find this record to be comprehensive and persuasive.  First, the

Government's brief cites to sources from Colonial America, the founding era, and

Antebellum America.  Such historical evidence supports the Government's contention

that the historical record is consistent with the ban in § 922(g)(1) in a manner

contemplated by *Bruen*. *See Bruen*, 142 S. Ct. at 2127 (emphasizing that the Second

Amendment memorialized "pre-existing" rights and that the history of the late 1600's

and colonial American history is instructive in determining the relevant historical

references); *see also id.* at 2136 (stating "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.") (quoting *Heller*, 554 U.S. 634-35). In that vein, it is important to note that several of the colonies had laws disarming felons, even of the non-violent variety, even as to those who defamed acts of Congress or refused to defend the colonies. *Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 908 & n.11 (3d Cir. 2020) (surveying colonial laws from Pennsylvania, Connecticut, and Massachusetts). Furthermore, Pennsylvania, New Hampshire, and Massachusetts "at their ratification conventions . . . proposed amendments limiting the right to bear arms to both law-abiding and 'peaceable' citizens." *Id*. at 908.

To establish a history of felon firearm regulation, the Government points to numerous treatises, law review articles, and cases. The Government quotes Thomas M. Cooley's *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868) – itself cited by *Heller*, 554 U.S. at 616 – to show that "some classes of people were 'almost universally excluded' from exercising certain civic rights, including 'the felon, on obvious grounds.'" Furthermore, the Government finds support in an Eighth Circuit opinion that recognized the Second Amendment incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "did not preclude laws disarming . . . criminals." *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (Winter 1986)).

Similarly, the First Circuit has understood the right to bear arms in the founding era as "a civic right . . . limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship,* 29 N. Ky. L. Rev. 657, 679 (2002)).

In further canvassing the Circuits, the Fourth Circuit has found that felons "were excluded from the right to arms" in or around the founding era "because they were deemed unvirtuous." *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (quoting Reynolds, *A Critical Guide to the Second Amendment,* 62 Tenn. L. Rev. at 480). And the Seventh Circuit has pointed out that *Heller* identified as a "highly influential" precursor to the Second Amendment "the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604). That report explicitly recognized impositions of firearms restrictions on convicted criminals, stating "citizens have a personal right to bear arms 'unless for crimes committed.'" *Id*. (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)).

Finally, of the states whose state constitutions (ratified during the founding era) entitled their citizens to be armed, many "did not extend this right to persons convicted of crime." *Skoien*, 614 F.3d at 640. In light of this documented history, we agree that the right to bear arms is analogous to other civic rights that have

23

historically been subject to forfeiture by individuals convicted of crimes, including the right to vote, the right to serve on a jury, and the right to hold public office. *See, e.g., Richardson v. Ramirez*, 418 U.S. 24, 56 (1974); 28 U.S.C. § 1865(b)(5); *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998).

Even if the above historical examples are direct corollaries to § 922(g)(1), *Bruen* reminds us that there need not be an exact historical analogue. The issue is not, as Defendant would frame it, whether there were any laws disarming felons at the time of the founding in the exact same manner that § 922(g)(1) disarms felons. Justice Thomas made it clear that, "even if a modern day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2118.

*Bruen* instead dictates that we must decide whether the felon-in-possession ban at issue in this case is "consistent with" the nation's historical tradition of firearm regulation. *Id*. at 2131. Historical analysis of Colonial America, the founding era, and Antebellum America clearly confirms that there were several instances of the disarming of non-law-abiding or non-virtuous citizens at these times – so close to, and simultaneously with – the ratification of the Second Amendment. The Court finds that these examples are sufficient to show a tradition of limiting the possession of firearms to the class of citizens that society considered virtuous. The Court is therefore confident that it can rely on the historical record to find that the prohibition prescribed in § 922(g)(1) is consistent with the historical limitations of the Second

24

Amendment.  And while this provision may not be the "historical twin" of these historical references, it need not be.  *See Bruen*, 142 S. Ct. at 2133.

In short, because § 922(g)(1) is "consistent with the Second Amendment's text and historical understanding," the Court again finds that the statute is constitutional.  *See id*. at 2131.  Accordingly, Defendant's motion to dismiss Count 13 of the superseding indictment should be DENIED.

**B.**    ***The Motion to Strike Count 13's ACCA Allegation.***

ACCA provides for a 15-year mandatory minimum prison sentence in the case of a person who violates § 922(g) *and* has three previous convictions for a "violent felony" and/or a "serious drug offense" that were committed on occasions different from one another.  18 U.S.C. § 924(e)(1).  Defendant's next motion [D.E. 188] seeks to strike the allegation in the Government's superseding indictment that Defendant possesses the requisite ACCA predicates and is therefore eligible for ACCA's enhanced punishment relative to his § 922(g)(1) charge.[7]

Defendant does not have a remarkably long criminal history; however, he arguably has a sufficient criminal history for ACCA purposes.  Our review of the briefing indicates that the Government intends to rely on Defendant's prior cocaine-related convictions – two deriving from Florida state court and one from a federal court in the Northern District of Florida – as well as Defendant's aggravated assault conviction, which was resolved in Florida state court, to prove Defendant's worthiness

---

[7]    This motion alternatively asks to redact Count 13 to avoid exposing the jury to this prejudicial allegation before it deliberates on the other 17 crimes charged in the superseding indictment.  The Court addresses the issue of redaction below in its resolution of Defendant's separately filed motion to bifurcate.

of an ACCA enhancement.  The Government expressly concedes that it will *not* rely on Defendant's burglary conviction to justify ACCA's mandatory minimum punishment.  [D.E. 204 at 7].  This means that all of his cocaine-related convictions must count in order to trigger for ACCA's sentencing enhancement.

Defendant submits that his Florida cocaine-related convictions cannot qualify as ACCA predicates because there is a mismatch in the way Florida law and federal law define cocaine, rendering Florida's definition broader and therefore beyond the scope of ACCA's definition of a "serious drug offense."  Here, he may be on to something because, without these Florida drug convictions, the Government cannot meet its three-predicate burden.  However, the current state of Eleventh Circuit law effectively forecloses this argument – at least until the Supreme Court resolves a circuit split on this issue in Defendant's favor.  Defendant separately attacks his Florida aggravated assault conviction, but he also concedes that this argument is foreclosed by binding precedent.

Defendant does not challenge his federal drug conviction.  But he does additionally submit that the Supreme Court's recent decision in *Wooden v. United States*, 142 S. Ct. 1063 (2022), undermines the constitutionality of ACCA and therefore precludes its sentencing enhancement from operating in his case.  We explore each argument in turn.

### 1. *Defendant's state drug convictions qualify as ACCA predicates.*

Defendant presents two arguments relating to his cocaine-related convictions under Fla. Stat. § 893.13(1): one concerns "ioflupane" and the other concerns the

"stereoisomers" of cocaine.  With respect to the ioflupane argument, we agree that Defendant's mismatch theory is foreclosed by binding Eleventh Circuit precedent. And as far as stereoisomers are concerned, we find no merit in Defendant's mismatch theory even though the Government failed to specifically address this argument in its response to Defendant's motion to strike.

ACCA defines the term "serious drug offense" to include an offense under state law for conduct (i.e., manufacturing, distributing, or possessing with the intent to distribute or manufacture) involving a "controlled substance"; importantly, "controlled substance" is defined by a cross-reference to § 102 of the Controlled Substances Act ("CSA"), which is codified at 21 U.S.C. § 802.  *See* 18 U.S.C. § 924(e)(2)(A)(ii).  The CSA in turn defines "controlled substance" as a "drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter" – colloquially known as the "federal drug schedules." *See* 21 U.S.C. § 802(6).  The federal drug schedules, which are revised and updated from time to time, identify "cocaine, its salts, optical and geometric isomers, and salts of isomers" as a schedule II controlled substance.  *See* 21 U.S.C. § 812(a)(4).

The gravamen of Defendant's mismatch theory is that one of the essential elements of Fla. Stat. § 893.13(1) goes beyond the ACCA because Florida's definition of cocaine is broader than ACCA's definition of cocaine.  *See United States v. Jackson*, 55 F.4th 846, 850 (11th Cir. 2022) ("[A] state conviction cannot serve as an ACCA predicate offense if the state law under which the conviction occurred is categorically broader—that is, if it punishes more conduct—than ACCA's definition of a 'serious

drug offense.'"); *see also Mathis v. United States*, 136 S. Ct. 2243, 2251 (2016) ("[A] state crime cannot qualify as an ACCA predicate if its elements are broader than those of a listed generic offense."). This is so, Defendant posits, because on the day that he is alleged to have unlawfully possessed ammunition (i.e., October 6, 2020), Fla. Stat. § 893.13's definition of cocaine included chemical compounds that were not among the ones listed in schedule II of the CSA (i.e., the Florida statute included "ioflupane" and all "stereoisomers" of cocaine in 2020).[8]

Defendant's first mismatch theory relies on the assumption that ACCA's definition of "controlled substance" is governed by the federal schedules in effect on the date he engaged in the alleged § 922(g)(1) offense, rather than the schedules in effect on the date of his prior state convictions. That assumption is contrary to the Eleventh Circuit's opinion in *Jackson,* which holds that the federal schedules in effect at the time of the prior state conviction supply the definition of "controlled substance," and so Defendant's argument must fail because we are bound to follow this holding. *See Jackson*, 55 F.4th at 861. Defendant concedes this point, acknowledging that the argument is being preserved in the event that the Supreme Court reverses *Jackson* in the near future.[9]

In *Jackson,* the Eleventh Circuit expressly rejected the same mismatch argument that Defendant advances here. Like Mr. Abarca, Jackson contended that

---

[8]     In fact, Florida exempted "ioflupane" from its definition of cocaine in 2017.  *See* Fla. Stat. § 893.03 (2017); *Jackson*, 55 F.4th at 851 n. 3.

[9]     The Supreme Court granted certiorari in *Jackson* and heard oral argument on November 27, 2023.  At the time of this writing, the Supreme Court has not issued an opinion on the merits in *Jackson.*

his 1998 and 2004 convictions under Fla. Stat. § 893.13(1) did not meet the ACCA's definition of "serious drug offense" because the federal schedules did not enumerate ioflupane as a controlled substance at the time of his firearm conviction. *Jackson*, 55 F.4th at 850-51. Noting that this argument would work only "if ACCA's definition incorporates the version of the controlled-substances schedules in effect when a defendant commits the firearm offense" rather than the version in effect when he was convicted of his prior state drug offense, the Court categorically rejected Jackson's theory. *Id.* at 851, 856. Instead, and guided in part by Supreme Court precedent suggesting that construction of ACCA calls for a backward-looking approach, the panel's opinion unequivocally concluded "that ACCA's definition of a 'serious drug offense' under state law incorporates the federal drug schedules in effect at the time of the prior state conviction." *Id.* at 858. Thus, because Jackson's convictions under Fla. Stat. § 893.13(1) had occurred prior to 2015, the year in which ioflupane was removed from the federal drug schedules, his state convictions could effectively constitute ACCA offenses. *Id.* at 861.

To be clear, Defendant's state cocaine-related convictions occurred prior to 2015 – i.e., at a time during which both the Florida schedules and the federal drug schedules included ioflupane in their respective definitions of cocaine. Accordingly, there is no mismatch between his convictions under Florida law and ACCA's definition of "serious drug offense" that could justify striking these allegations from the indictment. To hold otherwise would be at odds with the Eleventh Circuit's unequivocal holding in *Jackson*, which is binding on this Court "unless and until [it]

is overruled or undermined to the point of abrogation by the Supreme Court." *Archer*, 531 F.3d at 1352 (citing *GTE Corp.*, 236 F.3d at 1300 n.8).  This is so even though the Supreme Court granted certiorari to review the *Jackson* opinion on May 15, 2023. *See Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1283–84 (11th Cir. 2015) ("grants of certiorari do not themselves change the law," and "[u]ntil the Supreme Court issues a decision that actually changes the law, we are duty-bound to apply [Eleventh Circuit] precedent").

But even if the Supreme Court were to reverse the Eleventh Circuit in *Jackson* and therefore hold that the definition of "controlled substance" at the time of the federal firearm offense controls, Defendant's ioflupane argument would still fail because, in 2020, both the Florida schedules and the federal schedules exempted ioflupane from the definition of cocaine.  *See* Fla. Stat. § 893.03 (2020); *Jackson*, 55 F.4th at 851 n. 3.  Accordingly, insofar as ioflupane is concerned, there is no mismatch between the Florida schedules and the federal schedules regardless of whether we look to the definition of a "controlled substance" at the time of the predicate offenses or the Defendant's alleged § 922(g)(1) offense.

We also find Defendant's second mismatch argument unpersuasive.  According to him, Florida's definition of cocaine remains broader than ACCA's definition because Florida includes within its definition any "stereoisomers" of cocaine whereas the CSA regulates only "optical and geometric" isomers of cocaine.

Defendant explains that optical and geometric isomers are two subsets of stereoisomers, whose molecular formulas and atomic connectivity vary based on the

type of atomic bonding and molecular spacing within them.   Further, Defendant asserts that while optical and geometric isomers are types of stereoisomers, not all cocaine stereoisomers are optical and geometric.   Thus, by including all stereoisomers, Florida's definition of cocaine is broader than ACCA's definition, which penalizes only optical and geometric isomers.   Not so.

We accept that geometric isomers and optical isomers are subcategories of stereoisomers but that they are *not* the only subcategories known to science.   There exist, for example, conformational isomers – a type of stereoisomer that is neither geometric nor optical.   Thus, at first blush, Defendant's argument appears to have legs because it is possible for a stereoisomer of cocaine to exist that is neither a geometric isomer of the drug nor an optical isomer of the drug.   The argument falters, however, because the CSA expressly expands the definition of "controlled substance" in a way that accounts for this discrepancy between Florida and federal law.

There are two general categories of isomers: constitutional isomers and stereoisomers.   As we discussed above, Florida law is expressly concerned with stereoisomers and federal law is expressly concerned with two discrete subsets of stereoisomers – i.e., geometric isomers and optical isomers.   It is generally understood that the term "stereoisomer" refers to molecules that have the same molecular formula and sequence of bonded atoms but nevertheless differ in the three-dimensional orientation of their atoms in space.   A "constitutional isomer," by contrast, refers to molecules that have the same molecular formula but differ in terms of their atoms' connectivity. This science lesson is largely beside the point, but it

serves as useful context for the following question: What makes up a molecule of cocaine?

On a molecular level, cocaine is comprised of 17 carbon atoms, 21 hydrogen atoms, 1 nitrogen atom, and 4 oxygen atoms: $C_{17}H_{21}NO_4$. *See, e.g.,* National Library of Medicine, *Cocaine*, PUBCHEM, https://pubchem.ncbi.nlm.nih.gov/compound/ cocaine (last visited Feb. 23, 2024). Under the CSA, a cocaine molecule qualifies as a schedule II controlled substance and so do its geometric and optical isomers. Under Florida law, a cocaine molecule qualifies as a controlled substance and so do its stereoisomers.

So, if Florida criminalizes the possession of a stereoisomer of $C_{17}H_{21}NO_4$ that is neither a geometric isomer nor an optical isomer, does that make Florida's definition of cocaine broader than the definition prescribed by ACCA and the CSA? *No.* ACCA and the CSA define that non-geometric, non-optical stereoisomer of cocaine as a schedule I controlled substance. *See* 21 U.S.C. §§ 802(6), 802(32), 813(a).

Specifically, ACCA defines a "controlled substance" by cross-referencing § 802 of the CSA. *See* 18 U.S.C. § 924(e)(2)(A)(ii). The CSA in turn defines a "controlled substance," but § 802 also defines a "controlled substance analogue" as a substance that has a "chemical structure [that] is *substantially similar* to the chemical substance of a controlled substance in schedule I or II." 21 U.S.C. § 802(32)(A)(i) (emphasis added). And Part B of the CSA further provides that a "*controlled substance analogue* shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I." 21 U.S.C.

§ 813(a) (emphasis added).  This provision of the law dooms Defendant's second mismatch theory because a non-geometric, non-optical stereoisomer of $C_{17}H_{21}NO_4$ is substantially similar to $C_{17}H_{21}NO_4$ (and its geometric isomers and optical isomers) by virtue of the fact that the we are concerned with the same molecule.

In sum, Defendant's argument is unavailing because he fails to account for the CSA's complete definition of a "controlled substance."  *See, e.g., Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) ("The whole-text canon refers to the principle that a judicial interpreter should consider the entire text, in view of its structure and of the physical and logical relation of its many parts, when interpreting any particular part of the text.") (internal quotations omitted and alterations adopted).  Florida's definition of cocaine is not materially broader than the definition prescribed by federal law.  The motion to strike must be DENIED to the extent it is based on this mismatch theory.

### 2.   Defendant's state aggravated assault charge qualifies as an ACCA predicate.

Defendant also challenges the use of his Florida conviction for aggravated assault on the ground that it does not constitute a "violent felony" for ACCA purposes. He acknowledges, however, that a recent Eleventh Circuit case forecloses this argument.  [D.E. 188 at 9-10] (citing *Sommers v. United States*, 66 F.4th 890, 896 (11th Cir. 2023)).  We agree that Defendant is not entitled to relief on this basis given this binding decision.  The motion to strike is also denied on this basis.

### 3.   *The Occasions Clause is constitutionally sound (for now).*

Finally, we turn to Defendant's post-*Wooden* constitutional challenges to ACCA.  ACCA imposes a 15-year mandatory minimum sentence on a defendant who is convicted of being a felon in possession of ammunition following three prior convictions for a "serious drug offense, . . . *committed on occasions different from one another*" (the "Occasions Clause").  18 U.S.C § 924(e) (emphasis added).  Defendant submits that the Occasions Clause renders the whole statute facially invalid because the Supreme Court's holding in *Wooden*, coupled with the *Apprendi* rule[10] and pre-*Wooden* Eleventh Circuit case law referring to ACCA as an enhancement statute to be applied by the judge (not the jury), must lead to the inevitable conclusion that the ACCA impermissibly invades the fact-finding domain of the jury.

Despite the Defendant's claims of irreparable unconstitutionality, he has failed to cite any legal authority supporting his position.  We do not find that the holding in *Wooden* dictates the unprecedented step of declaring ACCA facially unconstitutional.  To the contrary, the underlying logic of *Wooden* – a case stemming from an *as-applied challenge* to the Occasions Clause, which articulated a framework for its proper application *by judges* – suggests that the Supreme Court presumed the Occasions Clause's constitutional soundness.

*Wooden* involved the application of the Occasions Clause to a defendant who burglarized ten storage units on a single night, which led to his guilty plea to ten

---

[10]    In *Apprendi v. New Jersey*, 120 S. Ct. 2348 (2000) the Supreme Court held that both the Fifth and Sixth Amendments require that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."  *Id.* at 2355.

different counts of burglary. *Wooden*, 142 S. Ct. at 1067. Decades later, a federal judge found that those convictions qualified as offenses "committed on occasions different from one another," sufficient to subject Mr. Wooden to an ACCA enhancement. This was so even though Mr. Wooden raised factual objections to this determination on the basis that the burglaries happened during the same criminal episode, at the same business location, under the same roof. *Id.* at 1068. After the Sixth Circuit upheld his sentence enhancement, the Supreme Court granted certiorari and reversed.

Rejecting what it called the prosecution's "focus on the precise timing of elements—which can make someone a career criminal in the space of a minute," the Supreme Court held that Mr. Wooden's "one-after-another-after-another burglary of ten units in a single storage facility occurred on one 'occasion,' under a natural construction of that term[.]" *Id.* at 1069–70. In so holding, the Court instructed that determining an occurrence can be divined using a "multi-factored test" that considers "a range of circumstances" such as whether the offenses are "separated by substantial gaps in time," the "[p]roximity of location" where the offenses occurred, and "the character and relationship of the offenses." *Id.* at 1070–71. This test, the Court noted, "will be straightforward and intuitive" because, unlike offenses separated by substantial gaps in time or significant intervening events, "[o]ffenses committed close in time, in an uninterrupted course of conduct, will often count as part of one occasion." *Id.* at 1071. Accordingly, the Court held that Mr. Wooden's convictions for

burglaries committed on a single night, in an uninterrupted course of conduct, and at one location, "were for offenses committed on a single occasion." *Id.*

We cannot infer from this straightforward, narrow ruling any suggestion that the Supreme Court now considers the ACCA facially unconstitutional under the Fifth, Sixth, or any other amendment.[11]   Indeed, *Wooden* explicitly did not address whether the separate occasions determination must be made by a jury rather than a judge.  *See id.* at 1068 n.3.  Thus, in the absence of clear guidance from the Supreme Court indicating otherwise, we are bound by the law of our circuit that holds that the Occasions Clause, as applied by sentencing judges, is constitutionally sound.  *See United States v. Dudley*, 5 F.4th 1249, 1265 (11th Cir. 2021) ("[W]e have reaffirmed our holding that district courts may rely on non-elemental facts contained in *Shepard*-approved documents when deciding whether a defendant's predicate offenses were committed on occasions different from one another."); *United States v. Turner*, No. 22-10454, 2023 WL 4199180, at *3 (11th Cir. June 26, 2023) ("The district court committed no error in determining that the offenses underlying Turner's three drug convictions occurred on different occasions within the meaning of the ACCA"); *United States v. McRae*, No. 21-13905, 2023 WL 5091799, at *6 (11th Cir. Aug. 8, 2023) ("The record convinces us that the district court did not err, let alone plainly

---

[11]     One could perhaps make a colorable argument that the *Apprendi* and *Wooden* rulings combined open the door to as-applied challenges to the Occasions Clause in cases where a defendant proffers legitimate factual disputes in connection with the separate occasion inquiry or any other elemental fact of his state conviction.  That is obviously not the case here, where even under Justice Gorsuch's concurring opinion Defendant's prior convictions appear to constitute at least three separate occasions.  *See Wooden*, 142 S. Ct. at 1080 (Gorsuch, J., concurring) ("Who doubts that . . . two murders separated by years and miles take place on separate occasions?").

err, in determining that McRae had committed his cocaine offenses on different occasions."); *United States v. Penn*, 63 F.4th 1305, 1318 (11th Cir. 2023) (there was no plain error in district court's determination of the occasions inquiry where defendant raised the issue for the first time on appeal); *see also United States v. Erlinger*, 77 F.4th 617, 622 (7th Cir. 2023) (holding the *Wooden* did not address the Sixth Amendment questions and, as such, the court remains bound to its prior precedent empowering the sentencing judge to make the ACCA's different-occasions determination).[12]

Defendant's last-ditch vagueness theory also misses the mark, and we can quicky dispense with it because the Eleventh Circuit has also expressly rejected this argument. *See United States v. Jones*, No. 20-11841, 2022 WL 1763403, at *3 (11th Cir. June 1, 2022) (rejecting an identical argument and noting that "the different-occasion provision is not unconstitutionally vague[,] [because its] language gives persons of ordinary intelligence fair notice that committing qualifying offenses on different occasions will result in the sentencing enhancement, and it permits non-arbitrary enforcement, *see Johnson*, 576 U.S. at 595, through *Wooden*'s multifactor

---

[12]     The Supreme Court recently granted certiorari in *Erlinger*; oral arguments are scheduled for March 27, 2024.  Perhaps unsurprisingly, both the Government and the defendant in *Erlinger* appear to agree in their briefing submitted to the Supreme Court that Occasions Clause facts should be determined by a jury to avoid violating the Sixth Amendment.  Here, the Government submits that it is now the policy of the United States Attorney's Office for the Southern District of Florida to submit these issues to the jury to avoid what it perceives to be a potential Sixth Amendment violation.  Accordingly, the Government intends to submit evidence to the jury regarding Defendant's prior convictions so that the jury may find whether Defendant is eligible for an ACCA sentencing enhancement.

test, *see* 142 S. Ct. at 1071."); *United States v. McCall*, No. 18-15229, 2023 WL 2128304, at \*7 (11th Cir. Feb. 21, 2023) (same).

In sum, Defendant's constitutional challenges to ACCA lack merit. Defendant's Fifth and Sixth Amendment claims are premised on a contorted reading of *Wooden* that is not supported by the holding of the opinion and is at odds with the Eleventh Circuit's longstanding precedent upholding the legal soundness of ACCA being implemented by judges at sentencing. Accordingly, Defendant's motion to strike the ACCA allegations from the superseding indictment should be DENIED.

### C.    *The Motion to Bifurcate Trial on Count 13*

Having determined that, under the current state of the law, the sentencing judge (rather than the jury) can make the necessary findings regarding the ACCA allegation in Count 13 without violating the Sixth Amendment, we could recommend denying the motion to bifurcate as moot on the assumption that the jury would never hear the details about Defendant's past convictions for an allegedly "violent felony" and several "serious drug offenses." But since *Wooden*, the Government has taken the position that a jury must decide facts relevant to an Occasions Clause inquiry.[13] Therefore, pragmatically, we must wrestle with the issue of prejudice presented by the introduction of evidence relevant to whether Defendant previously committed ACCA-predicate felonies on three separate occasions.

---

[13]    The Government has adopted this position in its briefing. [D.E. 204 at 2]. And, as we noted above, *supra* at note 12, this position aligns with the position taken by the Government in the *Erlinger* appeal that is currently pending before the Supreme Court.

In addition to Count 13, the superseding indictment also charges Defendant with conspiracy to use firearms in furtherance of violent crimes, conspiracy to commit money laundering, racketeering, stalking, robbery, brandishing a firearm in furtherance of a crime of violence, discharging a firearm in furtherance of a crime of violence, extortion, conspiracy to obstruct justice, and obstruction of justice itself. Count 13 dovetails with Counts 10 (robbery), 11 (stalking), and 12 (firearm discharge) in that they all concern an alleged watch theft on October 6, 2020.

Given the overlap in substance and evidence, Defendant does not seek to bifurcate the trial on Count 13 pursuant to Federal Rule of Criminal Procedure 8(a) because of misjoinder. By contrast, Defendant asks for separate trial only under Federal Rule of Criminal Procedure 14(a), which provides for bifurcation if a consolidated trial "appears to prejudice" the defendant. *See also United States v. Walser*, 3 F.3d 380, 386 (11th Cir. 1993) (holding that the defendant carries a "heavy burden" on a Rule 14(a) motion because he must demonstrate with more than "conclusory allegations" that a consolidated trial would be "unfair" and would require him to suffer "compelling prejudice").

In addressing Defendant's contention that his trial would be unfair and unduly prejudicial if Count 13 were tried contemporaneously with the balance of crimes charged in the superseding indictment, the Court must note at the outset that we are largely in uncharted water post-*Wooden*. Sensing an approaching sea change in ACCA practice, the Government now plans to submit Occasions Clause questions to the jury to avoid potential Sixth Amendment issues that might arise from a judge's

application of *Wooden* during the sentencing phase of the case. We must therefore acknowledge that the prejudice described by Defendant is partially theoretical because the effectiveness of a limiting instruction regarding ACCA-related evidence has not been empirically studied.

With that said, common sense dictates that jurors will be psychologically affected by evidence relating to Defendant's "violent felony" and "serious drug offenses" from years ago. Indeed, the Government may seize every chance it gets to remind the jury of its belief that the "armed career criminal" sitting before them is responsible for the string of alleged robberies and related incidents charged in the superseding indictment. Yet this is precisely the type of juror poisoning that the Federal Rules of Evidence circumscribe for the purpose of avoiding undue prejudice. *See, e.g.,* FED. R. EVID. 403; FED. R. EVID. 404(b)(1); FED. R. EVID. 609(a).

The Court therefore doubts that a limiting instruction will be sufficient to cure the infection caused by asking a jury to consider Defendant's recidivism at the same time it considers the proof relevant to his other charged crimes. That concern is heightened by the pleading history relating to Count 13, as well as the apparent strength of the Government's evidence regarding this charge.

In the original indictment, the Government previously charged Defendant with only robbery, stalking, and unlawfully discharging a firearm regarding the alleged incident on October 6, 2020. [D.E. 3 at 7-8]. Almost one year later, the Government added Count 13 – the only recidivist crime charged – in the superseding indictment because Defendant allegedly possessed the shell casing on October 6, 2020, that was

recovered from the scene of the crime.[14]  We gather from the briefing that, to prove Count 13, the Government intends to call at least five witnesses: (1) the robbery victim; (2) an ATF agent who will opine that the shell casing at issue was manufactured outside of Florida; (3) a ballistics expert who will tie the shell casing recovered from the October 6, 2020, incident to other shell casings recovered from other crime scenes; (4) an unidentified fact witness who will tie Defendant to the shell casings recovered from the other crime scenes; and presumably (5) a witness capable of authenticating the surveillance video upon which the incident was recorded.

Although we may not appreciate at this juncture all the evidence that the Government intends to present with respect to Count 13, a few considerations derive from our observations.  First, it will not consume a substantial amount of resources to try Count 13; there are very few witnesses and only one victim, making the burden on the Government and the Court relatively low when compared to the risk of prejudice to Defendant.  Second, the strength of the Government's case regarding Count 13 appears to be, at this point in the litigation, somewhat weak in our view. Thus, there is some indication that the predominant utility of charging Count 13 may lie in its rare ability to put Defendant's criminal history on display for the jury that is being asked to decide whether Defendant committed a spree of armed robberies.

---

[14]     Although the Government is charging Defendant with discharging a firearm and possessing ammunition on October 6, 2020, we observe that the Government has *not* charged Defendant with possessing the firearm he allegedly discharged the shell casing from on that day.  The Court also understands that the Government has not recovered the firearm involved in this shooting, which has implications for the Government's proffered ballistics expert testimony that the Court must resolve separately.

41

To reiterate, it is now the Government's position that the Sixth Amendment requires the jury – not the judge – to make factual findings under ACCA's Occasions Clause. We are cognizant that this position comes with a unique perk: In the Government's best-case scenario, it secures a conviction on Count 13 and theoretically incapacitates Defendant for at least 15 years; but, at a minimum, the Government can paint its adversary as an "armed career criminal" in the eyes of the jury merely by pleading that he is one.

Given the nature of this case and the minor inefficiencies that will arise from trying Count 13 separately from the remainder of the crimes charged in the superseding indictment, we are persuaded that bifurcation is a prudent means of ensuring the fairness of Defendant's trial on all 18 charges. We therefore recommend that the Court GRANT this motion in one of two ways: either by trying Count 13 separately from the remaining charges and redacting the superseding indictment; or, alternatively, by bifurcating only the jury findings necessary to adjudicate the ACCA-enhancement issue. Under either approach, any undue prejudice caused by submission of the Defendant's past criminal history to the jury would be mitigated.

## III.   CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Count 13 should be **DENIED**, Defendant's motion to strike the ACCA allegation from Count 13 should be **DENIED**, and Defendant's motion to bifurcate the trial should be **GRANTED** in whole or in part as set forth above.

Pursuant to Local Magistrate Rule 4(b), the parties have seven (7) days to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the

parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Comm'r of Soc. Sec.,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 26th day of February 2024.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge