## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 22-CR-20505-GAYLES/TORRES

UNITED STATES OF AMERICA

    Plaintiff,

v.

KEVIN ABARCA, and
JORGE PEREZ-DECESPEDES,

    Defendants.
_____/

## REPORT AND RECOMMENDATION ON *DAUBERT* MOTION

    This matter is before the Court on Defendant Kevin Abarca's motion to strike the testimony of the Government's ballistics expert, Tyler Brown, who is a Criminalist 2 with the Miami-Dade Police Department Crime Lab. [D.E. 189]. The motion is fully briefed, and it was referred to the undersigned for disposition. [D.E. 201, 209]. The Court held a hearing on Defendant's motion on March 5, 2024, wherein Mr. Brown testified regarding his qualifications and experience as well as the methodology he employed in reaching his conclusions in this case. Having reviewed the briefing and benefitted from the evidence presented at the hearing, and otherwise being fully advised in the matter, the Court recommends that Defendant's motion be **GRANTED IN PART and DENIED IN PART** for the following reasons.

## I. BACKGROUND

Among other things, Defendant is charged with committing a spree of violent robberies in 2020. The Government therefore intends to introduce evidence regarding the firearms and ammunition used in furtherance of these charged crimes. Accordingly, the Government's expert, Tyler Brown of the Miami-Dade Police Department Crime Lab, studied two firearms and multiple sets of shell casings for the purpose of forming an expert opinion regarding the ballistics evidence associated with these firearms and shell casings. Mr. Brown ultimately reached three primary conclusions: (1) one set of shell casings was fired from one of the recovered firearms; (2) a second set of shell casings was fired from the other recovered firearm; and (3) a third set of shell casings was fired from a third, unrecovered firearm.[1]

## II. ANALYSIS

Defendant's motion seeks to prevent Mr. Brown from providing the expert testimony summarized above because, in his view, the Government cannot show that ballistics identification is a scientifically valid field or that Mr. Brown's methodology satisfies *Daubert*'s reliability threshold. Defendant first asks this Court for a wholesale exclusion of Mr. Brown's testimony. Alternatively, Defendant asks the

---

[1] This third category of shell casings appears to contain the *only* physical evidence tying Defendant to Count 13 of the superseding indictment, which charges Defendant with unlawfully being a felon in possession of ammunition. It is the Government's position that one shell casing recovered from the scene of a robbery on October 6, 2020, is a ballistic match to shell casings recovered from a separate crime scene that the Government alleges the Defendant to have participated in. The firearm associated with these shell casings has not been recovered; however, Mr. Brown speculates that these shell casings were fired from a fifth-generation, 9mm pistol manufactured by Glock.

Court to limit his testimony and thereby prohibit him from stating that he is "certain" or "100%" sure about his conclusions; put differently, Defendant seeks to preclude Mr. Brown from coloring his expert opinion with an air of infallibility. Additionally, Defendant seeks an order compelling the Government to acknowledge that the foundational validity of firearm analysis as a field has not been established.

Defendant primarily relies on two studies, the PCAST and NAS reports, that are critical of the methodology involved in toolmark examination. He submits that (1) the field is not subject to peer review; (2) the number of studies regarding rates of error is insufficient; (3) the examination process is impermissibly subjective; and (4) there are not uniform standards governing examinations. Altogether, Defendant essentially asks this Court to make an unprecedented finding in our circuit that ballistics identification, as a field, is not sufficiently reliable to pass muster under *Daubert*.

As we discuss in more detail below, this sweeping proposition is at odds with the overwhelming weight of federal authority holding that ballistics experts are indeed permitted to testify as Federal Rule of Evidence 702 experts. Therefore, we are unpersuaded by the broad argument Defendant makes. The trial judge is best positioned to consider some of Defendant's alternative arguments in terms of how this evidence is presented to the jury. At minimum, however, Mr. Brown's testimony should reflect that his conclusions are subject to a disputed rate of error, and thus incapable of conveying absolute scientific certainty. Moreover, Mr. Brown's testimony should be presented in accordance with the directives of the Department

of Justice's Uniform Language for Testimony and Reports ("ULTR") for the Forensic Firearms/Toolmarks disciplines. Thus, to this limited extent the pending motion can be **GRANTED in part**. Otherwise, however, it should be **DENIED**.

### A. *Governing Principles under Rule 702*

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert, v. Merrell Dow Pharm., Inc.*, 509 U.S. 589 (1993)). The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Yet, in its role as a gatekeeper, the court's duty is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

To facilitate this process, district courts engage in a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir. 2010); *City of Tuscaloosa v. Harcros Chemicals,* 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted).

The Eleventh Circuit refers to these requirements as the "qualification," "reliability," and "helpfulness" prongs, which "remain distinct concepts" such that "courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). The aforementioned factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. And because exclusion of expert testimony is the "exception rather than the rule," Rule 702 advisory committee's note, it is important to note that a "district court's gatekeeper role . . . 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence." *Daubert*, 509 U.S. at

5

580; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

### B.      *Mr. Brown's Testimony Satisfies* Daubert

As noted earlier, Defendant's challenge to the Government's expert focuses primarily on the reliability prong. Defendant calls into question the validity of the entire field of ballistics analysis and claims that Mr. Brown's method and technique for ballistics examination—i.e., the Association of Firearm and Tool Mark ("AFTE") method—is unreliable. Yet, neither the record nor any of the testimony adduced at the hearing persuade us that Mr. Brown's testimony based on the field of ballistics analysis is too invalid or unreliable to withstand *Daubert* scrutiny. To the contrary, and consistent with virtually every federal court that has addressed the admissibility of ballistics experts under Rule 702, we find that the Government has successfully met its burden in demonstrating the reliability of Mr. Brown's testimony.

As a threshold matter, we are unconvinced that any of the evidence proffered by the Defendant—including the PCAST and NAS reports—sufficiently undermines the foundational validity of the ballistics analysis field to the extent of rendering the entire practice inadmissible for *Daubert* purposes. Defendant has certainly made a good case that this testimony should not be taken as gospel and is subject to challenge. But even in that case, the Government need not show that expert

6

testimony is infallible to an absolute or near absolute certainty in order to present it to the trier of fact. *See, e.g., Banta Properties, Inc. v. Arch Specialty Ins. Co.*, 2011 WL 13096149, at *4 (S.D. Fla. Dec. 20, 2011) ("[a]n expert's method need not be perfect, nor need he apply it perfectly"); *Bacho v. Rough Country, LLC*, 2016 WL 4607880, at *5 (N.D. Ga. Mar. 17, 2016) ("[t]he methodology need only be sufficiently reliable under *Daubert*, not infallible." (*citing Quiet Tech.*, 326 F.3d at 1340–41).

Although the 2016 PCAST report (which cites to the older NAS report) is critical of certain aspects of ballistics analysis, nowhere in this report does one find the categorical conclusion that Defendant seems to extrapolate from it: Ballistics analysis is a pseudo-science unfit for judicial proceedings. Indeed, the report itself contemplates admission of this type of testimony in court, provided that the error rate of its black-box study is reported. *See* PCAST Report at 12. In this sense, we echo Judge Seitz's observation that Defendant "appears to overstate the PCAST Report's conclusions," because the "Report falls short of stating that the field of ballistics identification is invalid or unreliable." *United States v. Miller*, No. 21-cr-20323-SEITZ, [D.E. 62 at 9–10] (S.D. Fla. Apr. 8, 2022) (denying motion to exclude ballistics expert on identical unreliability challenge; noting that the PCAST Report suggests that better training could lower error rates and that studies postdating the PCAST Report addressed its critiques and established that ballistics identification can be tested for reliability). Nothing in the record leads us to conclude otherwise. We turn to some specific challenges and reliability factors to draw our conclusions.

### *1.  Testing and Peer Review*

We first conclude that the Government has met its burden of showing that the proffered testimony has been sufficiently tested and peer reviewed to satisfy *Daubert*. Substantial evidence was introduced in this record to hold that Mr. Brown's methodology has been sufficiently tested and exposed to peer review.  As the Government points out, Mr. Brown's ballistic analysis method has been tested by the Miami-Dade Police Department Crime Lab and the Ames Laboratory Study, both of which suggest that the AFTE method is reproducible and testable.  [D.E. 201 at 8-9]. Mr. Brown also testified at the hearing that he can point to several other similar studies involving different types of firearms and conducted at various times, before and after the PCAST report, that bolster his conclusions.

Notwithstanding Defendant's arguments to the contrary, the Court finds such testimony and the supporting materials cited by the expert as adequate to find that this field of study is sufficiently reliable.  As Judge Seitz put it in reaching a similar conclusion, "[t]he experts' conclusions can be challenged in some objective sense and are not instead simply a subjective, conclusory approach that cannot be reasonably assessed for reliability. Specific observations supporting an expert's opinion can be thoroughly critiqued on cross-examination."  *Miller*, No. 21-cr-20323-SEITZ at 10 (quotes and citation omitted).

Likewise, the Government has made a sufficient showing that the AFTE methodology has been peer-reviewed, not just by AFTE's own journals but also by

additional scientific literature that postdates the PCAST and NAS reports.[2]  Indeed, several federal courts have found that the publication in the AFTE Journal alone meets *Daubert*'s requirements.  *See United States v. Ashburn*, 88 F. Supp. 3d 239, 245–46 (E.D.N.Y. 2015) (finding that the AFTE method has been subjected to peer review through the AFTE Journal); *United States v. Otero*, 849 F. Supp. 2d 425, 433 (D.N.J. 2012) (describing the AFTE Journal's peer reviewing process and finding that the methodology has been subjected to peer review); *United States v. Taylor*, 663 F. Supp. 2d 1170, 1176 (D.N.M. 2009) (finding that the AFTE method has been subjected to peer review through the AFTE Journal and two articles submitted by the government in a peer-reviewed journal about the methodology); *United States v. Monteiro*, 407 F. Supp. 2d 351, 366–67 (D. Mass. 2006) (describing the AFTE Journal's peer reviewing process and finding that it meets the *Daubert* peer review element).

Defendant's arguments that these tests and studies are themselves subject to challenge are well taken.  But even if we agree with much of what Defendant highlights, those are ultimately factual challenges that go to the weight of the evidence.  We clearly cannot reach a conclusion as a matter of determinative law that the weaknesses in the studies render them *per se* invalid.  For instance, how one treats "inconclusive" results in those studies (i.e., whether they can simply be excluded in measuring the error rate as the proponents argue, or whether instead

---

[2] The peer review factor "[is] a relevant, though not dispositive, consideration in assessing the validity of a particular technique or methodology on which an opinion is premised." *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786.

each such result constitutes an error that should be counted as such) is a matter that experts can reasonably disagree about. In short, critics of this type of testimony argue that the studies citing less than five percent error rates are skewed and misleading because inconclusive results are not treated as errors. But that dispute clearly prompts, at best, cross-examination and rebuttal expert testimony. It does not compel wholesale exclusion of the entire field of analysis, which is supported by several studies and testing methodologies that conclude that the rate of error by trained analysts is substantially less than five percent. One need only look at the PCAST report itself for evidence of such a study and implied recognition by even critics of this testimony that there is a scientific basis for ballistics analysis.

Consequently, the Government has presented enough evidence supporting a prima facie finding of reliability for the expert's analysis based on adequate scientific testing and peer review.

### 2.   *Rate of Error*

Based on the available record and the Government's evidence presented at the hearing, this element is also satisfied. As the Government's response makes clear, studies of the AFTE method have reported articulable and testable error rates of "less than 1.2% and the false positive rate at "1.52%" respectively." [D.E. 201 at 8]. And a cursory survey of recent federal rulings considering this same question makes clear that AFTE method has been subjected to post-PCAST studies that have consistently reported low false positive rates of error. *See United States v. Harris*, 502 F. Supp. 3d 28, 39 (D.D.C. 2020) (admitting ballistics expert and discussing "nineteen toolmark validation studies conducted between 1998 and 2019, of which eleven

10

studies had a false positive error rate of zero percent, and the highest false positive error rate calculated was 1.6%"); *Miller*, No. 21-cr-20323-SEITZ at 11 ("[p]ost-PCAST studies reveal error rates significantly lower [than those reported in the PCAST Report]"). Thus, the Government has met its burden to show that the AFTE method has a rate or a potential rate of error that is sufficiently low to satisfy *Daubert*. *See United States v. Johnson*, 2019 WL 1130258, at *19 (S.D.N.Y. Mar. 11, 2019), *aff'd*, 861 F. App'x 483 (2d Cir. 2021) ("even accepting the PCAST Report's assertion that the error rate could be as high as 1 in 46, or close to 2.2%, such an error rate is not impermissibly high").

Again, Defendant's challenges to the error rate calculation (discussed above) may warrant review by the trier of fact. But those challenges do not persuade us that the field of study is simply unreliable *per se*. To the contrary, the fact that inconclusive results are excluded in the error rate analysis seems quite sound and consistent with the scientific method because inconclusive results are neither a false positive nor a false negative. In light of that, the record presented on this motion amply supports a prima facie finding that ballistics analysis has been adequately tested and measured for error rates to assure a sufficient level of reliability.[3]

---

[3] Mr. Brown conceded at the hearing that he is unaware of any peer-reviewed studies that attempt to calculate an error rate for ammunition-matching where the firearm has not been recovered by the examiner. This does not change our conclusion because Mr. Brown further explained that the studies he is familiar with require the use of known firearms because test-firing from known firearms gives the researchers the ability to determine whether an examiner of two given shell casings is accurately concluding whether the shell casings derive from the same firearm or different firearms. Accordingly, the absence of a recovered firearm does not affect the efficacy of a casing-to-casing comparison. Mr. Brown acknowledged, however, that he is

### *3.     Controlling Standards and Degree of Acceptance*

The absence of controlling standards dictating the conclusions of the AFTE method is the only *Daubert* factor that weighs against admissibility of the expert testimony in this case, as the Government does not seriously dispute that ballistics analysis inherently entails the application of subjective judgment calls by the examiner. Nevertheless, we agree with the Government that the presence of subjectivity in the execution of ballistics identification is not enough to render the method unfit for *Daubert* purposes.

The subjectivity involved in ballistics analysis is not of the kind that is completely detached from reality. Instead, the subjective assessments made when determining a match between two bullet casings or when linking them to a particular handgun are based on empirical observations of physical traits that are measurable and reproducible for objective inspection. In this context, while in part subjective, a ballistics expert's conclusions rest upon articulable observations and are grounded in tangible physical evidence, which can be subject to challenge through cross-examination in court. This case is no exception, as Mr. Brown documented "in detail, through note-taking and photographs, the basis for his findings," and shared these

---

unable to determine what firearm the third set of casings dispensed from because that firearm was not recovered. A test-fire of the recovered firearm is necessary to validate such a conclusion. Mr. Brown's speculation that the third set of shell casings derives from a Glock is therefore not part of his expert opinion in this case; it is merely speculation. And clearly the Government should not imply otherwise at trial or try and rely on Mr. Brown's testimony as a basis to argue that the missing firearm was in fact a Glock.

materials with Defendant. [D.E. 201 at 7]. Mr. Brown's work was also peer-reviewed by at least one other examiner in the Miami-Dade Police Department Crime Lab. *Id.*

As the Eleventh Circuit has held in other *Daubert* contexts, the existence of some degree of subjectivity is not fatal to the reliability of an otherwise sound methodology. *See United States v. Hood*, 846 F. App'x 825, 829 (11th Cir. 2021) ("the district court acted in accordance with our caselaw and the decisions of other circuits that have upheld such evidence as reliable under *Daubert*, notwithstanding the subjective nature of the ACE-V method"); *see also Harris*, 502 F. Supp. at 42 ("a partially subjective methodology is not inherently unreliable, or an immediate bar to admissibility"). Thus, we are not convinced that the degree of subjectivity inherent in ballistics identification renders the practice inadmissible under *Daubert*.

This conclusion is strengthened when one considers that the methods and techniques for ballistics analysis employed by Mr. Brown in this case enjoy widespread acceptance in the relevant forensic community. *See Harris*, 502 F. Supp. at 42 ("firearm and toolmark identification is practiced by accredited laboratories in the United States and throughout the world, including England (Scotland Yard), New Zealand, Canada, South Africa, Australia, Germany, Sweden, Greece, Turkey, China, Mexico, Singapore, Malaysia, Belgium, Netherlands, and Denmark").

In sum, after balancing all the *Daubert* factors relevant to this reliability determination, we find that the Government has met its burden. Thus, Defendant's motion for exclusion should be **DENIED**, and Mr. Brown should be allowed to offer expert testimony at Defendant's trial.

### C. *Mr. Barr's Testimony Should be Limited*

On the other hand, Defendant's argument that Mr. Brown's testimony should be limited to reflect that his conclusions in this case are subject to a rate of error and, thus, cannot denote absolute certainty, is well taken.

That being said, the limitations that Defendant moves this Court to impose upon Mr. Brown are too extreme and unwarranted. Basically, Defendant asks that this court to endorse the findings made by the PCAST Report in 2016 and to force Mr. Brown to adopt those findings, particularly with respect to the rate of error for false positives reported in the black-box study. While Defendant himself is free to continue to rely in those findings and to confront Mr. Brown with their significance on the witness stand, we find no basis to force the Government's expert to adopt the PCAST findings; experts are free to choose the literature upon which they wish to rely in forming their expert conclusions.

Instead, and consistent with the limitations that recent federal rulings addressing this same issue have endorsed, we recommend that Mr. Brown's testimony be tethered to the directives of the DOJ's ULTR for the forensic toolmarks and firearms disciplines. *See Miller*, No. 21-cr-20323-SEITZ at 13 ("The Court finds limiting expert testimony language consistent with the DOJ ULTR appropriate in this case"); *Harris*, 502 F. Supp. at 45 ("the Court instructs Mr. Monturo to abide by the expert testimony limitations detailed in the DOJ ULTR."). By doing so, the expert's testimony cannot be presented as absolute scientific certainty, and he must acknowledge and explain to the jury the significance of rates of error in the field of ballistics analysis. And as noted earlier, he can only speculate as to the type of

firearm that was used to generate the 9 millimeter casings from the second robbery. So he should thus be precluded from rendering any definitive opinion as to the firearm involved.

Beyond this, any further limitations on his testimony are best presented to the trial judge at the time the expert's testimony is presented to the jury. The pending motion should thus be **GRANTED** in limited part.

### III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's motion to exclude ballistics evidence be **DENIED** subject to the limitations addressed above that warrant the motion being **GRANTED** in limited part. Pursuant to Local Magistrate Rule 4(b), good cause exists to expedite a response. The parties have **seven (7) days** to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from de novo determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g.*, *Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Comm'r of Soc. Sec.*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 5th day of March, 2024.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
Chief United States Magistrate Judge